UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BIOSIG INSTRUMENTS, INC.,**

        Plaintiff,

v.

**THE NAUTILUS GROUP, INC.,**

        Defendant.

**Case No. 04 CIV. 6654 (AKH)**

---

## DECLARATION OF HUMAYUN SIDDIQI, ESQ.

I, Humayun Siddiqi, declare as follows:

1. I am an attorney with the Law Offices of Zafar Siddiqi, attorneys of record in the above-captioned action, and I am licensed to practice in the State of New York.

2. I have been and remain counsel of record in the instant action since before the action was filed. I participated in the various settlement communications and settlement conferences with Nautilus, and have personal knowledge of the facts set forth below.

3. Attached as Exhibit 1 hereto is a true and correct copy from my files of the chronology of correspondence (excluding e-mail) between Biosig and Nautilus prior to March of 2008. For ease of reference, the pages of the chronology are sequentially hand-numbered in the lower right hand corner, and those page numbers are referred to in the paragraphs below. While some correspondence is reproduced from my computer in unsigned form, I believe that each of the letters was sent on or about the dates indicated. E-mail correspondence between the parties is included in Nautilus's attachments to David Brogan's Declaration, which I also reference below.

4. While Biosig filed this action in August of 2004, through a series of four requests for extension, Nautilus did not answer until January of 2005. Ex. 1 at 7, 8, 10, 38, 39. Biosig

stipulated to those requests for extension, in part out of courtesy and in part because Nautilus expressed interest in settling the case.

5. On November 12, 2004, Biosig voluntarily provided Nautilus with a twenty six page infringement analysis (complete with charts, figures, and pictures) demonstrating how the heart rate monitor of Nautilus's Schwinn SRB 1800 exercise bike infringed. A true and correct copy of that analysis, as it was presented to Nautilus, is attached at pages 11-36 of Exhibit 1. The underlying analysis involved the deconstruction of a costly piece of exercise equipment, believed to be representative of Nautilus's other products. The analysis was memorialized in annotated pictures and a claim chart. Those materials mapped the precise language of Dr. Lekhtman's patent to specific structures in the exemplary product. Id.

6. The materials Biosig provided to Nautilus in November of 2004 also explained a second and less invasive protocol to test for infringement, and identified 30 additional products many of which Biosig had been able to gain access to and to confirm infringement using that protocol. Id. at 13-14. The intent of providing that test protocol was to demonstrate that it was relatively simple to identify infringing products without having to perform elaborate disassembly and testing. Nautilus never criticized that protocol as being inaccurate, nor did it ever suggest that it was incapable of using the protocol to quickly determine the extent of accused infringement.

7. Nautilus's boilerplate Answer served two months after Biosig provided its detailed analysis ignored the analysis entirely, alleging, despite having been put on notice of 31 infringing products, that Nautilus did not know which products were accused. See Ex. 1 at 40.

8. In January 2005, Nautilus expressed "very much interest in pursuing settlement discussions" and promised to call the "next week to schedule a meeting." Ex. 1 at 39.

9. In the proceeding weeks and months throughout the year 2005, while Nautilus continually expressed its interest in discussing settlement, it kept pushing the meeting date into the future. Nautilus's excuses ranged from an attorney's intervening trial, and waiting to hear back from Nautilus, to the responsible person from Nautilus being out of the office. See e-mail chronology attached to Nautilus's Bergan Declaration. Finally, during the month of October, 2005, Nautilus agreed to a settlement conference on November 29, 2005. See, e.g., Id. at 45.

10. At no time prior to the settlement conference on November 29, 2005, did Nautilus represent that Biosig's infringement contentions provided a year earlier lacked strength or were in any way insufficient. Rather, after receiving those materials, Nautilus a number of times in 2005 reiterated its interest in meeting to discuss settlement.

11. On December 16, 2005, Nautilus sent Biosig a letter (Ex. 1 at 53) providing an offensively low settlement offer and alleging for the first time that Nautilus needed more information in order to advance settlement discussions. Again, Nautilus reiterated that it was "eager to get more information regarding Biosig's infringement contentions and then continue settlement discussions." Id. at 53.

12. In response to a request from Biosig, Nautilus promised to provide informal discovery on the operation of Nautilus's products "by January 13, 2006." Id. at 57. Nautilus never fulfilled its promise.

13. Despite not receiving the promised information from Nautilus on the operation of its products, Biosig put together an even greater detailed infringement analysis, this time for the Schwinn 103 exercise bike. Like the first analysis, the second contained charts, figures, and

pictures demonstrating infringement. Attached at pages 59-80 of Exhibit 1 is a true and correct copy of the infringement analysis that Biosig provided to Nautilus on March 21, 2006.

14. Nautilus never responded to the March 2006 infringement analysis.

15. Biosig then expressed concern to me that if Biosig were to then abandon a settlement posture and commence an active litigation posture, my small law firm would not be able to keep pace with the likes of Nautilus's Ropes & Gray. Therefore during the summer and fall of 2006, I assisted Biosig in exploring other alternatives for representation.

16. In the fall of 2006, I understand that Biosig engaged Larry Hefter of the Finnegan firm for the purpose of overviewing the case and determining if other settlement opportunities might exist. I provided Larry Hefter with materials during that time. From the Fall of 2006 until April 2007, I had several telephone conversations with Mr. Hefter about the technical operations of the heart rate monitor installed on the Nautilus equipment and participated as one of Biosig's attorneys in several conversations between Mr. Hefter and Biosig.

17. On information and belief, Larry Hefter was up to speed by April of 2007, and contacted Nautilus's counsel to determine if Nautilus was still interested in settling. Nautilus said that it was, and the parties agreed to a face-to-face settlement conference in New York City on June 19, 2007.

18. I attended the settlement meeting in New York City on June 19, 2007, as one representative of Biosig. Also representing Biosig at that meeting was Finnegan's Larry Hefter, inventor and president of Biosig, Dr. Gregory Lekhtman, a Biosig investor and business associate, Dr. Cornfeld, and Biosig's Canadian counsel.

19. Also in attendance at the settlement conference were two of Nautilus's lawyers from Ropes & Gray and Nautilus's Senior Vice President and General Counsel Wayne Bolio,

who represented that he had flown in from Washington State for the meeting.  Mr. Bolio was active in conducting the negotiations.

20. At no time during the meeting on June 19, 2007, or at any time before April of this year did any Nautilus representative mention that delay was causing prejudice or that Nautilus ever viewed the case as already being over.  To the contrary, as it became clear that no final settlement would be reached at the June 19, 2007, settlement conference, Mr. Bolio suggested that some discovery should take place before settlement talks continue.

21. During the June 19, 2007, settlement conference, representatives of Biosig unequivocally reiterated that at least 30 of Nautilus's products infringe, that Nautilus is continuing to infringe as it introduces even more unauthorized products containing Dr. Lekhtman's patented heart rate monitor, that the harm to Biosig appears at least to be on the order of tens of millions of dollars, and that if a settlement could not be reached, Biosig intended to proceed with the litigation in the absence of a settlement.  The parties ended the settlement conference agreeing to disagree.  Mr. Bolio suggested that some discovery should take place before settlement talks continue.

22. In the fall of 2007, I was aware that Biosig was attempting to make financial arrangements that would enable it to hire a law firm with resources commensurate to that of Nautilus's Ropes & Gray.

23. Periodically during the pendency of the litigation, I would receive phone calls from a person representing herself as the Clerk of Court for Judge Owen.  When the Clerk called she asked me to advise on the status of the case.  I received one such call in the fall of 2007.  In response, I updated the Clerk on the status, advising that the case was still active.  I memorialized my confirmation in a follow-up letter to the Court.  Id. at 81.  During the call from

5

the clerk in the fall of 2007, the clerk also asked me to confirm the identity of a lawyer from Ropes & Gray who would have knowledge of the case. I gave the name of one of Ropes & Gray's attorneys of record and had the impression that the reason the Clerk asked for that information was so that the Clerk could make a similar call to Ropes & Gray.

24. On information and belief, in the first quarter of 2008, Biosig reached an arrangement that permitted it to hire Finnegan as litigation counsel, now of record and moving this case forward. Fortuitously, this occurred in the same time period that the case was transferred from Judge Owen to Judge Hellerstein.

25. I remain an attorney of record, serving as local counsel to Biosig, and am familiar with the correspondence and recent communications between counsel for the parties. I have participated in many of the recent telephone conferences involving Finnegan counsel and Ropes & Gray.

26. Beginning in mid-March, Finnegan attorneys negotiated and substantially agreed to a Case Management Plan with Nautilus (Ex. 2, subject to the court's ruling on the Motion to Dismiss), prepared a draft Protective Order for negotiation (Ex. 3), entered appearances, conferred on Rule 26 issues (See Ex. 4), and served Document Requests (Ex. 5) and Interrogatories (Ex. 6). Nautilus has already responded to Biosig's discovery requests (objecting to every discovery request and providing no substantive information) Ex. 7 and 8.

27. At no time before Finnegan appeared as litigation counsel did Nautilus raise a concern about the delay or prejudice. I was then the primary contact between Biosig and Nautilus, and Nautilus never led me to believe that time was ever an issue.

28. At no time during the pendency of this action has Biosig violated any court order, failed to appear for any conference, failed to respond to any court inquiries or sought any adjournments.

29. Biosig has not burdened the Court with motion practice or otherwise taxed the Court's resources.

30. As counsel for Biosig, I relied on Judge Owen's written rules of practice that there is no time limitation on reaching settlement (Ex. 9, last sentence of third paragraph), and I assumed Nautilus was doing the same. This, in combination with the ongoing settlement talks, the periodic calls from the Clerk confirming status, and the lack of any order requiring any additional action, led me to believe that the pace of the litigation was acceptable to both Nautilus and the Court.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct.

May 12, 2008

_____
Humayun Siddiqi